UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO
ALBUQUERQUE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO: 1:20-MJ-00957-LF |
| | ) | |
| Plaintiff, | ) | CRIMINAL |
| | ) | |
| vs. | ) | Albuquerque, New Mexico |
| | ) | |
| DANIEL LOGAN MOCK, | ) | Friday, March 20, 2020 |
| | ) | |
| Defendant. | ) | (9:45 a.m. to 10:29 a.m.) |

PRELIMINARY EXAMINATION / DETENTION HEARING

BEFORE THE HONORABLE KIRTAN KHALSA,
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For Plaintiff: JAYMIE ROYBAL, ESQ.
U.S. Attorney's Office
District of New Mexico
P.O. Box 607
Albuquerque, NM 87103

For Defendant: D. ERIC HANNUM, ESQ.
Lomas Law Complex
1025 1/2 Lomas NW
Albuquerque, NM 87102

U.S. Pretrial/Probation: Anthony Galaz

Court Reporter: Recorded; Liberty: Rio Grande

Clerk: C. Lopez

Transcribed By: Exceptional Reporting Services, Inc.
P.O. Box 8365
Corpus Christi, TX 78468
361 949-2988

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

## INDEX


| GOVERNMENT'S WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| DANIEL FONDSE | 6 | 17 | 21 | |

**ARGUMENT**

BY MR. ROYBAL 23

BY MR. HANNUM 23 / 30

**RULINGS**

RE PROBABLE CAUSE 23

RE DETENTION 26 / 30

**Albuquerque, New Mexico; Friday, March 20, 2020; 9:45 a.m.**

**(Defendant appearing via video conference)**

**(Call to order)**

**THE COURT:** All right, we're on the record in *United States of America versus Daniel Logan Mock*. Please enter your appearances.

**MS. ROYBAL:** Good morning, your Honor, Jaymie Roybal on behalf of the United States.

**THE COURT:** Good morning.

**MR. HANNUM:** Good morning, your Honor, Eric Hannum here on behalf of Daniel Mock. Mr. Mock is in the custody of the Government and appearing via video link.

**THE COURT:** Good morning, Mr. Mock.

**THE DEFENDANT:** Good morning, your Honor. How are you today?

**THE COURT:** I'm well, thank you. All right, Mr. Mock. We're scheduled for your preliminary hearing and detention hearing. We are handling this hearing by video conference, again to reduce your exposure to multiple people. We're trying to prevent the spread of this illness into the detention facilities. So there is going to be testimony. We're going to move the camera to make sure that you're able to see the witness that's testifying. When the camera panned out, there was the Government's attorney sitting at one table and your attorney sitting at the other table. So we're going to

proceed -- I'm sorry?

**MS. SPEAKER:** I just wanted to let you know I'm going to sit the witness at -- with the Government.

**THE COURT:** Oh, the witness is going to sit at the Government's table.

**MS. SPEAKER:** Yeah.

**THE COURT:** Okay. All right, we're going to set everything up and then I'll try to orient you so you have a sense of who's sitting where and who's who, okay?

**THE DEFENDANT:** Roger that, your Honor.

**THE COURT:** All right, is the Government ready to call a witness?

**MS. ROYBAL:** Your Honor, the United States calls Special Agent Daniel Fondse.

**THE COURT:** Okay.

**THE CLERK:** Please raise your right hand.

**DANIEL FONDSE, GOVERNMENT'S WITNESS, SWORN**

**THE CLERK:** Go ahead and have a seat.

**THE COURT:** Don't state your name yet. Let's get the camera over. Okay, Mr. Mock, looking into the camera, your attorney, Mr. Hannum, can you raise your hand, Mr. Hannum? This is your attorney, Mr. Hannum. And then in the background, Ms. Roybal, if you could raise your hand? That's the Government's attorney. And then sitting next to her is the witness, Agent Fondse, who is going to be testifying now. All

right, if you could please --

**THE DEFENDANT:** Yes, your Honor.

**THE COURT:** If you could please state your name?

**THE WITNESS:** My name's Daniel Fondse.

**THE COURT:** Spell your last name for the record.

**THE WITNESS:** F-O-N-D-S-E.

**THE COURT:** Mr. Fondse is under oath and the Government's attorney is going to begin her questioning of him.

**MS. ROYBAL:** Your Honor, just a preliminary matter. The defense counsel and I have stipulated to the admission of four exhibits. I have a copy if the Court -- would you like them all at once so there's not a lot of movement around the courtroom?

**THE COURT:** Sure. Now, are you going to be having these exhibits read?

**MS. ROYBAL:** Yes, your Honor.

**THE COURT:** Okay. So the Government's and your attorney have stipulated to four exhibits. These exhibits have been handed to me. You haven't seen a copy of them but as each of the exhibits is testified to, they're going to be read so you'll have an opportunity to know what each of these exhibits says, okay?

**THE DEFENDANT:** Yes, your Honor.

**THE COURT:** All right.

//

**DIRECT EXAMINATION**

**BY MS. ROYBAL:**

Q Special Agent Fondse, can you please share with us where you work and how long you've been employed there?

A Sure. I'm currently employed as a special agent with the FBI. I've been so employed since May of 2017. My current assignment is here in Albuquerque on a violent crimes squad. And one of my duties on that squad is to investigate things like threats made via means of interstate communication.

Q Are you a member of the team of agents that's investigating this case of *United States versus Daniel Mock*?

A Yes.

Q And do you see Mr. Mock present by way of video conference in the courtroom today?

A Yes, I do. I recognize him on the monitor.

Q Can you please identify perhaps an item of clothing that he's wearing?

A Sure. He's wearing glasses. He has a thick beard and he's wearing a brown jumpsuit.

**MS. ROYBAL:** Your Honor, for the record, the witness has identified the Defendant.

**MR. HANNUM:** Yes, your Honor.

**MS. ROYBAL:** So --

**THE COURT:** All right, the record will reflect a positive identification of Mr. Mock as the Defendant in this

case.

**BY MS. ROYBAL:**

Q Special Agent Fondse, when did the Defendant first come to the attention of the FBI?

A So with respect to the FBI here in Albuquerque, we were contacted in June of 2019 by law enforcement officers in the State of New York. They contacted us because a Facebook user with the name Daniel Mock had made some posts on an Oathkeepers website that concerned them.

Q What is Oathkeepers?

A Oathkeepers is a far-right antigovernment movement. It's somewhat unique in that it targets for recruitment current and former law enforcement and military members, and their main push is to protect what they perceive as overreaches and violations of the Constitution. As an example, one of their oaths is that they will not confiscate firearms. Another one is that they won't impose a state of martial law or a state of emergency in state.

Q And where were these comments made to the Oathkeepers?

A They were posted on the Oathkeepers Facebook page.

Q Now, you mentioned June of 2019; what was significant going on in June of 2019?

A So those posts were made in reference to an attack made on a Federal courthouse in Texas.

**MS. ROYBAL:** Your Honor, let the record reflect that

I'm showing the witness what has been admitted as Government's Exhibit 1.

Q Special Agent Fondse, what is this?

A This is a transcript of the posting made on June 17, 2019, by the Facebook user Daniel Mock.

Q And how do you recognize it?

A I recognize this from my previous experience in this investigation and my communications with the other special agents conducting the investigation.

Q Now, is the text of this Facebook post the same as reflected in the exhibits?

A Yes.

Q Can you please read the text of Exhibit 1 to the Court?

A "This guy is a hero attacking tyrannical and corrupt government organizations. We need more patriotic Americans like him attacking more government targets. Time to let the government know we won't be pushed around anymore. Use your Second Amendment right against this broke and oppressive system. Protect those who cannot protect themselves, and freedom on, my friends."

Q Why are these statements of interest to the FBI?

A These statements are of interest because they were in response to an attack on a Federal courthouse and because they advocate more attacks like that.

Q And whose user name was attributed to these statements?
A Daniel Mock.
Q I'd like to back up and ask if you could please explain to the Court what Facebook is.
A Facebook is a social networking company or application that's used on devices where users can make profiles of themselves, share photos. Organizations can also make pages for themselves. And it's a way for people to connect and share information as well as to espouse their political beliefs.

**THE COURT:** I'm willing to take judicial notice of what Facebook is. I don't know that we need that testimony. Mr. Hannum, do you believe we need to go into the details of what Facebook is?

**MR. HANNUM:** I am confident that the Court can take judicial notice of that, your Honor.

**THE COURT:** Okay.

**MS. ROYBAL:** Your Honor, I have a series of questions in regards to how an individual sets up a Facebook account; are those permissible? I believe it goes to probable cause in this case.

**THE COURT:** To determine whether Mr. Mock is in fact the individual who set up the Facebook page?

**MS. ROYBAL:** Yes, your Honor.

**THE COURT:** Okay, I'll allow those, although --

**MR. HANNUM:** Your Honor, I think for -- just for

today's purposes, we're not disputing that these statements were in fact from Mr. Mock, for today's purposes only.

**THE COURT:** Okay, all right. So, Mr. Mock, your attorney has indicated that you will stipulate for purposes of today's hearing that -- and only for purposes of today's hearing that the statements in these exhibits were and can be attributed to you.

**THE DEFENDANT:** That is correct, your Honor. I do understand what he means.

**THE COURT:** Okay. So let's -- with that stipulation we can maybe move on.

**BY MS. ROYBAL:**

Q So, Special Agent Fondse, I'd like to direct your attention to March the 2nd of 2020. Are you aware of a Facebook communication directed to a user on Facebook that goes by at G-O-V-M-L-G?

A Yes. Postings were made on the public Facebook page of the Government of New Mexico and they were made from a Facebook account with the user name of Daniel.Mock.965.

**MS. ROYBAL:** Your Honor, let the record reflect I'm handing the witness what has been previously admitted as Government's Exhibit 2.

Q Special Agent Fondse, what is this?

A This is a copy of the postings made on March 2nd.

Q And is this text of the Facebook post the same as

reflected in the exhibit?
A Yes.
Q Can you please read the exhibit?
A "There's never going to be a case. Focus your energy on more important things like tickets for the police officer's -- or for the police who violate traffic and parking laws. This is why we are going to execute you."
Q Special Agent Fondse, I'd like to direct your attention to March the 13th of 2020; are you aware of another Facebook communication directed to the same user, Governor Michelle Lujan Grisham?
A Yes. The same Facebook user, Daniel.Mock.965, made additional postings on the 13th.
**MS. ROYBAL:** Your Honor, let the record reflect I'm handing the witness what has been marked as Government's Exhibit 3.
Q Special Agent Fondse, what is Exhibit 3?
A This is a copy of the postings made on March 13th.
Q And is the text of the Facebook post the same as reflected in the exhibit?
A Yes.
Q Can you please read the text of the post?
A "Time to pick up your rifles and kill this governor so we can reestablish the Constitution as law of New Mexico. I'm done with corrupt government. They will serve the people or

die."

Q Are you aware of another Facebook communication directed to the same user on the same day?

A Yes.

**MS. ROYBAL:** Let the record reflect I'm handing the witness what has been marked as Government's Exhibit 4.

Q What is Government's 4?

A It's the text from the additional posting on March 13th.

Q Can you please read the text?

A It says: "I am going to begin red flagging myself in order to combat and kill all police and government officials who are in violation of the Constitution. All officers who respond will be executed for tyranny so ask yourself is violating my rights worth your life; because I have no fear of killing bad men and dying for the people."

Q What if anything was significant on the date of March the 13th, 2020?

A That date and the dates around them were significant because that was the time when the government was stepping up its response to the coronavirus and the Governor of New Mexico issued statements and orders restricting a lot of things in New Mexico, such as closing schools and doing other means to protect the population here.

Q Now, the Defendant has stipulated that these Facebook posts came from his account, but can you just share what the

FBI did to investigate this Facebook account?

A The FBI requested information from Facebook regarding this account. Facebook provided an IP address related to the account that the posts were made from, and from that IP address, the FBI was able to determine that has been associated recently with both T-Mobile and with AT and T. Additionally, Facebook provided lat./long. coordinates where that account -- where the device that used that account was located on March 13th.

Q And where was that device located?

A So the coordinates were in the vicinity of Copper and Third Northwest here in Albuquerque. They reported it with an accuracy of 16 meters. So on March 14th, FBI agents responded that location to check for businesses and residences and other stuff in that area. At approximately 220 Copper, they noted a building and inside that building there was a door with the word "harvest" on it. It appeared to be a dispensary. Further investigation showed that there's a dispensary called the "Harvest Foundation" located at that address.

Q And is the Defendant employed?

A A law enforcement records check showed that his likely employer is the Harvest Foundation.

Q Okay, where is -- you mentioned that T-Mobile and AT and T were associated with the IP addresses; where is T-Mobile located?

A It's located in Parsippany, New Jersey.
Q Where is AT and T located?
A It's located in Texas.
Q Where is Facebook located?
A Menlo Park, California.
Q And as part of the investigation, did the FBI determine what type of device was being used to post these statements?
A Based on the fact that the cellular providers are -- were the ones that were responsible for that IP address, it's likely that they were made using a smartphone. Additionally, in a later mirandized interview, the Defendant, Mr. Mock, said that he used his phone to make those postings. A Samsung phone was seized pursuant to his arrest. And Samsung's a company that's headquartered in Korea, South Korea.
Q As part of the investigation, did law enforcement speak with anyone regarding these Facebook posts?
A They did. They contacted an individual who was identified as a cohabitant and girlfriend of Mr. Mock.
Q And what if anything did she say about these Facebook posts?
A She said that he had made the posts on the governor's website, that he was blowing off steam, and that he didn't mean it.
Q To your knowledge, does the Defendant own firearms?
A No.

Q To your knowledge, has he ever tried to purchase firearms?

A Yes. Twice, once in 2014 and once in 2016, Mr. Mock attempted to purchase firearms but was denied.

Q Special Agent Fondse, I'd like to direct your attention to the Defendant's arrest; when was that?

A The arrest was earlier this week.

Q And can you please describe for the Court how that arrest took place?

A Agents for the FBI were looking for Mr. Mock to arrest him pursuant to an arrest warrant issued by this Court. He was located in the vicinity of the uptown shopping center. State police vehicles -- marked State police vehicles had blocked off his car and plain-clothesed FBI agents observed him approaching the area. As Mr. Mock approached the car and his behavior indicated that he recognized there were police vehicles there, he turned and walked in a different direction between other vehicles. At some point during the arrest, he ended up throwing his keys which possibly landed on another moving vehicle in the parking lot, and it took some time for agents to locate his keys.

Q Did the FBI conduct an interview with the Defendant after his arrest?

A Yes, it did. Mr. Mock was advised of his *Miranda* rights and he agreed to speak with investigators.

Q Did he know why he was being investigated?

A Through some of his responses, it indicated that he understood why he was going to be investigated.
Q And did he make any statements in regards to the Facebook posts?
A He did. He was shown copies of the two posts which have previously been entered as exhibits, the posts made on March 13th, and he admitted to making both of those posts.
Q And can you describe what his demeanor was like during the interview?
A At times he was upset, he was apologetic, and at one point he said he chose his words poorly.
Q Did he make any other statements that were relevant to the investigation?
A Investigators asked Mr. Mock if there was a gun at his residence. He said that to his knowledge there wasn't one unless his girlfriend had purchased one without him knowing about it. Agents confronted him with a photo of a firearm which he had posted to his Facebook page and he told the agents that that was a gun that a friend had brought over to his house. He had taken a picture and posted it on his Facebook page because he wanted to look cool. Other agents who had responded to his residence with his girlfriend had asked her if there were any guns in the residence and she produced a firearm which she said belonged to her. When agents confronted Mr. Mock with that information, he apologized. He said that he

had known the gun was there and that he had been dishonest because he didn't want to involve his girlfriend because he didn't want her to get caught up with the trouble he was in.

Q Did he make any other statements relevant to his views about the government during that interview?

A He did. He said that he would take action against the government in what he described as an Armageddon or an apocalyptic situation in which he viewed the government had overreached and had trampled on the constitutional rights of people. He said he would only fire if fired upon and that he would act in his own self-defense and in the defense of others.

**MS. ROYBAL:** Your Honor, I pass the witness at this time.

**THE COURT:** All right, Mr. Mock, your attorney is now going to cross examine Agent Fondse.

**MR. HANNUM:** Good morning, --

**THE DEFENDANT:** Yes, your Honor.

**MR. HANNUM:** -- Agent Fondse.

**THE WITNESS:** Good morning, sir.

**CROSS EXAMINATION**

**BY MR. HANNUM:**

Q When you conducted this investigation, there were no indications that --

**THE COURT:** Hold on one second. Mr. Mock, are you able to hear your attorney?

**THE WITNESS:** Yes, I can hear him well enough.

**THE COURT:** Okay, why don't you try to speak into that microphone? I know it puts you in a slightly odd position but if -- you can hold the microphone and face toward the --

**BY MR. HANNUM:**

Q There were no indications that he had taken any actual steps towards carrying out any of these threats, were there?

A So to clarify, I'm not aware of all of the aspects of the investigation, but I'm not aware of any acts.

Q Okay. And you're fully participating in this investigation, right?

A I'm involved but there are a number of agents involved in this investigation and so there's no way I could possibly know everything that everyone else has observed and been involved with. Also, this is somewhat of a tight timeline on this schedule. These postings were made last Friday, on the 13th.

Q I understand. But if other agents had been aware of affirmative steps towards carrying out some of these threats, it's pretty likely you would know about it, isn't it?

A It's possible. But can you clarify for me what you mean by "steps?"

Q I mean like traveling to the governor's residence in Santa Fe, for example.

A So I'm not aware of that, no.

Q Okay. Other -- any -- you're not aware of any other

affirmative steps to harm anyone, are you?

A No. So to qualify it, though, I would say that there was a firearm in his residence. Additionally, there was another inoperable rifle which his girlfriend had described that he'd been working on. It's something that's termed an 80 percent rifle. I'm not sure if you're familiar with that. The ATF doesn't restrict rifles that are made to a certain level and so work needs to be done to low receive in order to make them a functional firearm. And so there was one of those located in his residence.

Q Okay, but those are not steps towards harm, are they?

A I --

**MR. HANNUM:** I'll withdraw the question.

**THE WITNESS:** Okay.

**BY MR. HANNUM:**

Q But he told you that he -- when confronted, he admitted that he had lied to you about his girlfriend owning a firearm, right?

A To the agents in the interview.

Q Okay. And he explained that by saying that he didn't want to get her caught up in this trouble, right?

A That's correct, caught up, hemmed up, it was something like that.

Q Okay. So that untruth was to protect her, as far as you know.

A That's the statement he made.
Q Okay. Now, you said while being arrested he -- or when law enforcement officers approached his car, he saw what appeared to be law enforcement officers and walked the other direction, correct?
A That's correct.
Q He didn't run, did he?
A So from their description to me, he was taking action so as to not be apprehended that day with the law enforcement at his car.
Q That's your opinion.
A So he went between two vehicles in the vicinity of his car and agents had to approach at gunpoint in order to take him into arrest because he was between two vehicles. The agent who was up there told me he didn't know if Mr. Mock was trying to carjack somebody or get into another vehicle and that's why he approached in that manner.
Q In fact Mr. Mock was not trying to carjack anyone, was he?
A To my knowledge, no.
Q Now, as far as you know, Mr. Mock had been working at the Harvest dispensary in downtown Albuquerque; is that correct?
A That's my understanding, yes.

**MR. HANNUM:** Okay. Your Honor, I don't have any more questions for this witness, thank you. Thank you, Agent.

**THE COURT:** Any redirect?

**MS. ROYBAL:** Just one question, your Honor, that I forgot the first round.

**REDIRECT EXAMINATION**

**BY MS. ROYBAL:**

Q Special Agent Fondse, to your knowledge was the victim in this case, that being the governor, made aware of these statements?

A Yes, she was. The post was originally noticed by her press secretary who contacted the head of her security detail who contacted the FBI and then at some point through that process the governor was briefed on the situation.

**THE COURT:** I have one other thing that I want to just clarify. I stopped the Government from getting too far into details about the Facebook, how Facebook works, how posts are made, and so I may have prevented the Government from engaging in questioning that would establish the interstate communication of these threats. There was some reference to I think T-Mobile, and I can certainly take judicial notice of how these communications were made, but unless you're willing to stipulate, I will ask her to question with regard to the interstate.

**MR. HANNUM:** Your Honor, I do believe the agent testified that Facebook is headquartered in another state.

**THE COURT:** Oh, did he? I didn't recall that.

**MR. HANNUM:** So I think that's been established. And

we will stipulate for today's purposes that there's an interstate nexus.

**THE COURT:** Okay, all right.

**MS. ROYBAL:** No further questions, your Honor.

**THE COURT:** All right, Agent Fondse, you are excused. Any other witnesses for the Government?

**MS. ROYBAL:** No, your Honor.

**THE COURT:** Do you have any witnesses?

**MR. HANNUM:** No, your Honor.

**THE COURT:** All right, I don't need argument on the question of probable cause but I will allow the parties if you wish for the record to make any argument that you want. Do you need to make argument?

**MS. ROYBAL:** Your Honor, I think for purposes of a record we should do that.

**THE COURT:** Well you have your testimony. I don't need you to make any argument. But I will give the Defendant and his counsel an opportunity if they wish.

**MR. HANNUM:** Your Honor, our emphasis today is really the question of detention. And we thought it would be useful to the Court to hear an outline of the Government's case. That's why we asked for the preliminary hearing as well. We don't have any argument about probable cause at this stage.

//

//

**THE COURT:** All right, then based on the witness's testimony, I find probable cause to support the two counts of interstate communication threats in violation of 18 United States Code, Section 875, as charged in the criminal complaint. Having found probable cause, we will now proceed to the detention hearing. And, let's see, I have the Pretrial Services Report. Did you have an opportunity to talk to Mr. Mock about the report?

**MR. HANNUM:** I have, your Honor.

**THE COURT:** And Pretrial's recommendations?

**MR. HANNUM:** Yes, your Honor.

**THE COURT:** Okay. All right, Mr. Mock, it's the Government's burden. The Government's seeking your detention. It's the Government's burden of proof. I'm going to hear from Government counsel first and then we will turn to your attorney for his arguments.

**MS. ROYBAL:** Your Honor, the United States supports Pretrial's recommendation that there is no condition or combination of conditions that can reasonably assure the Defendant's appearance and the safety of the community. Your Honor, as the Court heard today, the -- this defendant harbors a very serious sentiment regarding antigovernment and antiauthority. The nature of this offense is quite serious. This defendant has threatened to kill a sitting governor. He does not have a history of mental health issues as described in

the Pretrial Report so he appears to have been of sound mind when he made these threats. The weight of the evidence against the Defendant is strong. The Facebook posts came from his account. His girlfriend told the FBI that he made the Facebook posts and then he further admitted that he made the Facebook posts. The Pretrial Services Report doesn't indicate that the Defendant has significant ties to the community, which I believe give him incentive to flee. So he's no longer employed here, his children live in Texas, and other family of his lives in Florida.

In regards to the Defendant's criminal history, he does have a combination of violent offenses, one of those being battery, and the victim was his girlfriend. He has narcotics-related offenses, including possession of controlled substances and had various offenses while he was in the military related to larceny of government property and desertion. And additionally I'll highlight for the record that he also has a bad conduct discharge from the military. The -- a court in Florida revoked his bond and his driver's license was suspended for failure to pay court costs. Two state courts in New Mexico, those being Alamogordo and Bernalillo, have both had to issue warrants for his failure to appear. And that most recent warrant issued for his failure to appear was just in December of 2019. Your Honor, an additional concern of the United States is that the Defendant lied to the FBI about the firearm

that was present in his house. And it's most concerning about his statements regarding his preparedness to take action in the event of government overreach. And, your Honor, in light of the current public health crisis in the State of New Mexico, and specifically the fact that the victim in this case, that being the governor, is issuing emergency orders seemingly every day to close schools and restaurants and other parts of our society, I don't know if that is what this Defendant would regard as government overreach with which he would then take action for but I believe that he represents a danger to the community more broadly and I believe the risk of releasing him is just too high at this time.

**MR. HANNUM:** Your Honor, I would point out that Mr. Mock has lived here in Albuquerque for about two years, according to the Pretrial Report. He has been employed steadily. I don't believe he's any kind of a flight risk. Certainly the probable cause that we have essentially stipulated to suggests some antigovernment views. Still, I don't believe there's been any suggestion that he has ever taken any action on these views so I would suggest he's not a threat to the community. He has some ties to the community. And, you know, the Government references our current public health crisis as a reason to keep him in. I would suggest the exact opposite interpretation of that problem. Keeping more people in custody only exacerbates anticipated problems with

virus control in facilities. This is not a violent offense and he's not shown himself to be any risk of fleeing the jurisdiction so I'd ask that he be released pending trial.

**THE COURT:** The difficulty that this case presents is that in order to -- I mean, clearly the Defendant poses a risk of dangerousness. He's made threats as recently as March 13th to -- toward the governor and also toward law enforcement who respond to any acts that he takes. In fact, he says all officers will be executed. And when people pose a danger to the community, the Court still has to consider whether there are conditions that can be fashioned in the community to adequately mitigate that risk, and those conditions are things like supervision by Pretrial Services, maybe placement in a halfway house, which isn't available right now because of this virus. But when I have somebody who talks about executing officers, Pretrial Services officers are law enforcement. And if Mr. Mock believes that being placed under conditions is a violation of his constitutional rights because he has an opinion about government overreach, then how do we even ensure the safety of the officers that are supervising him and their ability to effectively supervise him and get his compliance to mitigate the risk of dangerousness that he poses? That's the quandary that the Court faces. At this time, Mr. Mock, I find by clear and --

**THE DEFENDANT:** Your Honor, --

**THE COURT:** -- convincing evidence --

**THE DEFENDANT:** -- if I may?

**THE COURT:** -- that you're a danger to the community and that no --

**THE DEFENDANT:** Your Honor, if I may?

**THE COURT:** -- condition or combination of conditions of release will adequately mitigate that risk so I'm going to detain you on that basis. However, --

**THE DEFENDANT:** Your Honor, if I --

**THE COURT:** I'm sorry?

**THE DEFENDANT:** May I please be allowed to make a statement, your Honor, just briefly?

**THE COURT:** Well, --

**THE DEFENDANT:** I --

**THE COURT:** Sir, one minute, --

**THE DEFENDANT:** I understand the --

**THE COURT:** -- Mr. Mock.

**THE DEFENDANT:** -- gravity of everything.

**THE COURT:** Mr. Mock, before you speak, --

**THE DEFENDANT:** Yes.

**THE COURT:** -- I want to remind you of your right to remain silent. And we're in a --

**THE DEFENDANT:** Yes, ma'am.

**THE COURT:** -- bit of a difficult situation because your attorney should be able to consult with you before you

make a statement and advise you --

**THE DEFENDANT:** I --

**THE COURT:** It's better for your attorney to hear what you have to say and then he can make the statement on your behalf so that you're not waiving your Fifth Amendment privileges. We're in a --

**THE DEFENDANT:** I do understand that.

**THE COURT:** -- tough situation -- hold on, don't speak yet. So what I'd like to do, I know there's a phone right there and we talked about figuring out how to address this issue, right? And is there a way for Mr. Mock to talk to his attorney over this line that's sitting right there, Mr. McCoy, or --

**MR. HANNUM:** Your Honor, if I could make a suggestion, I --

**THE COURT:** (Indisc.)

**MR. HANNUM:** -- was able to speak with Mr. Mock from a phone in one of the waiting -- one of the conference rooms right outside.

**THE COURT:** Right, but he'd have to be moved so -- I'm sorry?

**MR. SPEAKER:** And that's okay.

**MR. SPEAKER:** This can be placed on mute, though.

**MS. SPEAKER:** Yes.

**MR. SPEAKER:** This can be placed on mute.

**MR. SPEAKER:** Hold on.

**MR. SPEAKER:** So, your Honor, what we can do is we can just move him back to the on-deck phone.

**THE COURT:** Okay.

**MR. SPEAKER:** We'll leave this running and all this other stuff, we'll just take him over to the on-deck phone. They have that number. I believe it's 4819. If he wants to call, speak to him as long as he can, as soon as he's done with that conversation, we'll just bring him back over here.

**THE COURT:** Okay, thank you.

**MR. SPEAKER:** And is that a sufficient --

**THE COURT:** Yes, thank you.

**MR. SPEAKER:** Yes.

**THE COURT:** So you can go out there --

**THE DEFENDANT:** Thank you, your Honor.

**THE COURT:** We'll -- he's going to be taken to another room.

**MR. HANNUM:** Thank you, Judge. I think five minutes would be plenty of time.

**THE COURT:** Okay.

**MR. HANNUM:** Thank you.

**(Recess taken from 10:18 a.m. to 10:23 a.m.)**

**THE COURT:** All right, we're back on the record in *United States of America versus Daniel Mock*. All right, counsel.

**MR. HANNUM:** Thank you, your Honor, for giving me a moment to speak with Mr. Mock. I've talked with Mr. Mock and I've -- he's asked me to convey some things to the Court on his behalf. He will not be making a statement himself. Mr. Mock just wishes the Court to understand that he does not consider whatever restraint or conditions might be imposed if he were released into the community to be unconstitutional. He does not consider that to be a violation of his rights. He understands that the Court and Court's officers and law enforcement officers would be acting appropriately to check up on him, to supervise him. So he asked me to convey that to the Court. He also asked me to convey that he is the only support for his family, his wife. He's got kids in El Paso that he has supported. And he assures the Court that he is willing to work with any kind of conditions that the Court might impose, and he's not -- he does not view those to be any kind of infringement of his rights and would fully cooperate. So thank you for that opportunity to speak with Mr. Mock.

**THE COURT:** Okay. So what -- in this case, at this moment in time, I have not been presented with nor am I aware of any conditions that I could set at this time that would adequately mitigate the risk of dangerousness that Mr. Mock poses. I also think he poses a flight risk but I do think that if we can get control of and figure out some conditions that would mitigate his risk of dangerousness, there would be

potentially conditions that could be imposed to mitigate his risk of flight. So what I am going to suggest to you, at this time I am going to be detaining Mr. Mock. But if you could get with -- he has family in Florida. Maybe you can talk to his family and see if there's a suitable -- a potential suitable third party custodian that could be considered and vetted by the -- by Pretrial Services, and then you can file a petition to review this. At this time, the only available residence that I'm aware of is back in Albuquerque with his girlfriend. She possesses firearms. He was not honest about her possession of firearms. And she was the victim of a domestic violence situation. That is not a suitable place for him to reside. So I don't -- there are no conditions that I'm aware of at this time that would adequately mitigate the risk of dangerousness Mr. Mock poses. However, I will review conditions if you have something to present down the road. And I would suggest that you get with Mr. Mock and suggest some potential third party custodians and let Pretrial vet that and we can come back.

**MR. HANNUM:** Yes, your Honor, thank you.

**THE COURT:** All right, Mr. Mock, at this time you're remanded to the custody of the Marshals Service. However, the Court will consider any proposals that you and your attorney present with regard to potential conditions of release that could adequately mitigate the risk of danger that you pose to the community.

**THE DEFENDANT:** Your Honor, is there a possibility of an ankle monitoring system or something like that where I have to constantly be on a system constantly under 24-hour surveillance or something like that?

**THE COURT:** That is something -- yes, that's something I alluded to conditions that might adequately mitigate --

**THE DEFENDANT:** Okay.

**THE COURT:** -- your flight risk, and that would be something that I would --

**THE DEFENDANT:** Oh, okay.

**THE COURT:** -- put into place. But right now there's the other --

**THE DEFENDANT:** Okay, I just wanted to clarify.

**THE COURT:** Okay.

**THE DEFENDANT:** Yes, that's before I began to ask my attorney any certain question, I just wanted --

**THE COURT:** Yes.

**THE DEFENDANT:** -- to clarify. Thank you, your Honor.

**THE COURT:** Yes, GPS monitoring is certainly one of the conditions that if we can find a suitable third party custodian and a suitable residence that's -- and other conditions --

**THE DEFENDANT:** Your --

**THE COURT:** -- that will adequately mitigate your risk. I mean, it may be that having him go out of state somewhere far away from the governor may at least address one aspect of his dangerousness. It doesn't absolutely address the dangerousness that he poses to supervising officers. But, again, if you come up with any suggestions, the Court will consider those.

**MR. HANNUM:** Thank you.

**THE COURT:** And, Mr. Galaz, please if there are proposed third party custodians, please vet those people.

**PRETRIAL OFFICER GALAZ:** Absolutely, your Honor.

**THE COURT:** All right, we're in recess on this matter.

**MR. HANNUM:** Thank you, Judge.

**THE DEFENDANT:** Thank you, your Honor.

**(This proceeding was adjourned at 10:29 a.m.)**

**CERTIFICATION**

**I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.**

**April 23, 2020**

**Signed** **Dated**

***TONI HUDSON, TRANSCRIBER***